# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3389 | **DATE** | 7/22/2003 |
| **CASE TITLE** | USA vs. United States Funds | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  For the reasons stated above, the Court denies the plaintiff's motion for summary judgment (10-1). The Court will shortly schedule a status hearing at which time a trial date will be set. In the meantime, Atallah and Marcos should determine whether they intent to retain counsel, or if they are financially unable to do so (and can prove this by completing the requisite forms under oath), whether to seek appointment of counsel from the Court's Trial Bar pursuant to Northern District of Illinois Local Rule 83.35 - 83.36
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUL 2 3 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 17 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 02 C 3389 |
| FIFTEEN THOUSAND, EIGHT HUNDRED DOLLARS ($15,800) IN UNITED STATES FUNDS, | ) ) ) ) ) |
| Defendant. | ) ) |
| PETER ATALLAH and NEVAL MARCOS, | ) ) |
| Claimants. | ) |

DOCKETED
JUL 23 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This is a civil *in rem* forfeiture action brought by the government pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 983. The government contends that $15,800 in United States currency that it seized from Peter Atallah at O'Hare Airport on July 25, 2001 is subject to forfeiture because it is the proceeds of, or was intended to facilitate, an illegal narcotics transaction. Atallah and his wife Neval Marcos have made claims for the seized funds. They say that $6,800 belonged to Atallah and $9,000 belonged to Marcos; that the money came from bank accounts and earnings; and that it was to be used for purposes of a vacation and for gambling.

The government has moved for summary judgment. Atallah and Marcos were given until June 10, 2003 to respond. On June 6, Atallah sent a letter to the Clerk asking for an additional thirty days. But no response was filed even after this time had passed. The Court therefore

17

considers the motion without the benefit of Atallah and Marcos's views.

Under the law, money furnished or intended to be furnished by any person in exchange for illegal narcotics, proceeds of illegal narcotics sales, and money used or intended to be used to facilitate a narcotics deal is subject to forfeiture. 21 U.S.C. § 881(a)(6). The government's burden in such cases used to be to establish "probable cause"; if it did so, the burden then shifted to the claimant to prove by a preponderance of the evidence that the property was not connected with illegal narcotics activities. *See, e.g., United States v. $506,231 in United States Currency,* 125 F.3d 442, 451 (7th Cir. 1997). But this changed with the passage (in 2001) of the Civil Asset Forfeiture Reform Act. *See* 18 U.S.C. § 983. Now, the government concedes, to forfeit the funds it bears the burden of proving by a preponderance of the evidence that the currency is subject to forfeiture – in this case, that the currency was the proceeds of, or was intended to facilitate, an illegal narcotics transaction. *Id.* § 983(c)(1).

In considering the government's motion for summary judgment, we view the evidence in the light most favorable to the non-moving parties (Atallah and Marcos), drawing reasonable inferences in their favor. We may grant the motion only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable fact finder could return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *United States v. 5 S 351 Tuthill Road, Naperville, Illinois,* 233 F.3d 1017, 1024 (7th Cir. 2000).

2

In support of its motion for summary judgment, the government has offered evidence which we summarize as follows. At the time the currency was seized, Atallah was at O'Hare Airport, evidently between planes, en route from Detroit, Michigan to San Diego, California, where he and Marcos live. The government says that Detroit is "a drug-use city" and that San Diego is "a drug-source city." Govt. Mem. at 10. Just before he was apparently to board an airplane, Atallah was stopped by a Drug Enforcement Administration Task Force Officer who had observed him behaving suspiciously: he was constantly looking around, and he first approached the ticket counter but then abruptly jumped into the line of passengers boarding the airplane.

At that point the officer approached Atallah and began to question him. Atallah gave conflicting and, in some respects, implausible answers regarding the purpose of his trip and other details. He also gave untruthful and conflicting answers to questions about the amount of money he was carrying. He said he had been in Detroit with his wife (Marcos), but they were traveling on separate flights, which the officer viewed as suspicious (though we note that Atallah evidently advised the agent that he and Marcos had had some marital problems).

Atallah initially stated that the money he was carrying was for a potential business opportunity with his brother in Detroit that he had ultimately decided not to pursue. When asked about the source of the funds, Atallah said that about $10,000 had come from a bank account in California about two years earlier; he also indicated that he was a card dealer at a casino.

The currency was detained based on Atallah's conflicting statements. The money was concealed in a DEA office at the airport, and a Cook County Sheriff's Police officer brought a "narcotic detector dog" named Bax into the room and gave him a command to search for drugs.

3

Bax alerted to the location where Atallah's currency had been placed. The government has submitted extensive records reflecting that Bax is certified as a narcotic detector dog and has been trained extensively. He has not alerted on about half of the searches he has conducted. Drugs have been found after 66% of Bax's alerts; drugs or currency have been found after 98.4% of the alerts.

The government has submitted Atallah and Marcos's income tax returns and records from their bank accounts. The bank records do not reflect withdrawals during the five months preceding the seizure that would account for the funds, contrary to Marcos's claim that the $9,000 was withdrawn from her bank account during that period. The records also reflect a significant amount of funds that cannot be accounted for by Atallah and Marcos's reported income.

All of this gives good reason to believe that Atallah (and Marcos) had something to hide, that they may well be lying about why they were in Detroit and where the money had come from, and that the money likely constituted unreported income. But although it is plainly illegal not to report all of one's income, unreported income is not forfeitable under the provisions cited by the government. To prevail, the government must prove that the currency had something to do with an illegal narcotics transaction – either that it was the proceeds of, or was going to be used in, a drug deal.

The only evidence that the government offers that focuses in on the alleged narcotics nexus – as opposed to other types of nefarious activity, or simply unreported income – involves the cities to and from which Atallah was traveling and the evidence regarding the narcotic detection dog. That evidence does not add up to much. First, calling Detroit a "drug-use city"

4

(that is actually the term used in the government's brief!) tells us nothing of substance. These days *all* big cities, and most medium sized and smaller cities as well, are plagued by drug use and thus could be placed under the same heading. The government has offered no basis to believe that the fact that one is traveling to or from Detroit makes it any more likely that the traveler is involved in drug transactions. San Diego arguably may be a bit higher up the scale due to its proximity to the Mexican border and its characterization as a "drug-source city," but Atallah had a legitimate reason to travel to and from San Diego: he lives there (in El Cajon, a San Diego suburb).[1]

The evidence regarding the narcotic detection dog superficially suggests that Atallah and/or his currency had something to do with drugs, but on closer inspection this evidence likewise adds little of substance to the mix, at least based on what the government has shown thus far. Virtually all United States currency carries traces of illegal drugs, apparently because traces of narcotics contained on some currency gets into mechanized counters at banks and then is transferred to other currency, and because the ink on the currency bonds with the narcotics. *See, e.g., United States v. Buchanan*, 213 F.3d 302, 315 n.1 (6th Cir. 2000) (Jones, J. and Moore, J., concurring).[2] For this reason, courts have in recent years expressed skepticism regarding the probative value of evidence that a dog (even a highly skilled dog like Bax) detected narcotics traces on currency. *Id.; see also, e.g., United States v. $5,000 in United States Currency*, 40 F.3d 846, 848-49 (6th Cir. 1994); *United States v. United States Currency, $30,060.00*, 39 F.3d 1039,

---

[1] The government has also made no effort to rebut Atallah's claim that he has relatives in Detroit, which likewise would have given him a legitimate reason to travel to and from that city.

[2] Though the cited opinion from *Buchanan* is nominally a concurring opinion, it actually represents the opinion of the majority of the three-judge Sixth Circuit panel that heard the case.

5

1042 (9th Cir. 1994); *United States v. Carr*, 25 F.3d 1194, 1216 (3d Cir. 1994) (Becker, J., concurring in part and dissenting in part); *United States v. $191,910.00 in United States Currency*, 16 F.3d 1051, 1062 n.21 (9th Cir. 1994); *Jones v. Drug Enforcement Administration*, 819 F. Supp. 698, 719, 720 (M.D. Tenn. 1993). Without evidence reflecting that Bax would not have alerted to drug residue in the amount found on currency generally, *see United States v. $22,474.00 in United States Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001), the fact that he alerted in this case carries hardly any weight – particularly because we are required to view the evidence and draw reasonable inferences in the light most favorable to Atallah and Marcos, the non-moving parties.

The Court recognizes, of course, that the evidence of where Atallah was traveling to and from, and the fact that the dog alerted to the currency, does not stand in isolation and cannot properly be viewed that way, either by a fact finder or by a court considering a summary judgment motion. But even if one looks at the evidence in its entirety, viewing it in the light most favorable to Atallah and Marcos as we are required to do in the present context, it does not add up to proof as a matter of law that the currency was the proceeds of or was intended for use in a drug deal. A reasonable fact finder evaluating all the evidence certainly could determine that the currency was indeed drug-related. But the Court can grant summary judgment only if *no* reasonable fact finder could find to the contrary. And this we cannot say. A reasonable fact finder could conclude, for example, that the currency simply constituted unreported income or the proceeds of non-drug-related nefarious activity. If so, that would not put Atallah and Marcos in a particularly good light, but the currency would not be subject to forfeiture. Final determination of whether the government has met its burden will have to follow a trial.

6

## Conclusion

For the reasons stated above, the Court denies the plaintiff's motion for summary judgment [docket item 10-1]. The Court will shortly schedule a status hearing at which we will set a trial date. In the meantime, Atallah and Marcos should determine whether they intend to retain counsel, or if they are financially unable to do so (and can prove this by completing the requisite forms under oath), whether to seek appointment of counsel from the Court's Trial Bar pursuant to Northern District of Illinois Local Rule 83.35 - 83.36.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 22, 2003